### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **CBL & ASSOCIATES** | § | **Chapter 11** |
| **PROPERTIES, INC.,** *et al.*, | § | **Case No. 20-35226** |
| | § | |
| Debtors.[1] | § | |
| -------------------------------------------------- | § | |
| | § | **Adversary Proc. No. 20-____** |
| **CBL & ASSOCIATES** | § | |
| **PROPERTIES, INC.,** *et al.*, | § | **(Emergency Hearing Requested)** |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **WELLS FARGO BANK,** | § | |
| **NATIONAL ASSOCIATION,** | § | |
| | § | |
| **Defendant.** | § | |
| | § | |
| -------------------------------------------------- | § | |

### DEBTORS' EMERGENCY MOTION
### FOR AN ORDER (1) GRANTING A TEMPORARY RESTRAINING ORDER AND
### (2) GRANTING A PRELIMINARY INJUNCTION ENJOINING
### WELLS FARGO'S IMPROPER EXERCISE OF REMEDIES

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/CBLProperties. The Debtors' service address for the purposes of these chapter 11 cases is 2030 Hamilton Place Blvd., Suite 500, Chattanooga, Tennessee 37421.

i

**EMERGENCY RELIEF HAS BEEN REQUESTED. IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE.**

**PLEASE NOTE THAT ON MARCH 24, 2020, THROUGH THE ENTRY OF GENERAL ORDER 2020-10, THE COURT INVOKED THE PROTOCOL FOR EMERGENCY PUBLIC HEALTH OR SAFETY CONDITIONS.**

**IT IS ANTICIPATED THAT ALL PERSONS WILL APPEAR TELEPHONICALLY AND ALSO MAY APPEAR VIA VIDEO AT THIS HEARING.   AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S REGULAR DIAL-IN NUMBER. THE DIAL-IN NUMBER IS +1 (832) 917-1510. YOU WILL BE RESPONSIBLE FOR YOUR OWN LONG-DISTANCE CHARGES. YOU WILL BE ASKED TO KEY IN THE CONFERENCE ROOM NUMBER. JUDGE JONES' CONFERENCE ROOM NUMBER IS 205691.**

**PARTIES MAY PARTICIPATE IN ELECTRONIC HEARINGS BY USE OF AN INTERNET CONNECTION. THE COURT UTILIZES GOTOMEETING FOR ALL VIDEO HEARINGS. TO CONNECT TO A HEARING, YOU MAY CONNECT USING THE LINK ON EACH JUDGE'S HOMEPAGE ON THE SOUTHERN DISTRICT OF TEXAS WEBSITE OR CONNECT DIRECTLY VIA THE GOTOMEETING APP.**

**TO CONNECT TO A HEARING, YOU SHOULD ENTER THE MEETING CODE "JudgeJones". IT IS RECOMMENDED THAT YOU DOWNLOAD THE FREE GOTOMEETING APP ON EACH DEVICE THAT WILL BE USED TO CONNECT TO A HEARING. CONNECTING VIA WEB BROWSER ONLY MAY LIMIT THE AVAILABILITY OF SOME GOTOMEETING FEATURES.**

**ONCE CONNECTED TO GOTOMEETING, A PARTICIPANT MUST CLICK THE SETTING ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.**

### TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................................................................................................1

FACTUAL BACKGROUND .......................................................................................................3

    I.       CBL'S BUSINESS AND THE FIRST LIEN CREDIT FACILITY ...........................3

    II.      CBL'S RESPONSE TO THE COVID-19 CRISIS...................................................5

    III.    WELLS FARGO ALLEGES BASELESS DEFAULTS UNDER THE FIRST
             LIEN CREDIT AGREEMENT .................................................................................8

    IV.    GOOD FAITH NEGOTIATIONS WITH STAKEHOLDERS AND THE
             RESTRUCTURING SUPPORT AGREEMENT .......................................................9

    V.      WELLS FARGO ISSUES NOTICE OF ACCELERATION BASED ON
             MERITLESS ALLEGATIONS OF DEFAULT.........................................................10

    VI.    WELLS FARGO PURPORTS TO EXERCISE REMEDIES, FORCING CBL
             INTO AN IMMEDIATE CHAPTER 11 FILING ......................................................11

ARGUMENT ..............................................................................................................................14

    I.       INJUNCTIVE RELIEF AGAINST WELLS FARGO IS APPROPRIATE...............14

    II.      CBL IS LIKELY TO SUCCEED ON THE MERITS .................................................15

          A.      CBL did not default on the First Lien Credit Agreement's Liquidity
                  Covenant ...............................................................................................15

          B.      CBL did not default by failing to provide notice regarding a purported
                  breach of the Liquidity Covenant .................................................16

          C.      CBL did not make Restricted Payments in violation of the First Lien
                  Credit Agreement...............................................................................17

          D.      CBL's purported default related to certain interest payments was
                  waived by Wells Fargo Under the Forbearance Agreement ...........................18

          E.      The Administrative Agent erroneously claims that CBL has "generally
                  not pa[id] its debts as such debts become due."................................20

          F.      CBL did not fail to timely provide the Administrative Agent with a
                  compliance certificate .......................................................................22

G.     CBL did not default on the First Lien Credit Agreement when it entered into a Restructuring Support Agreement with certain bondholders ........................................................................................22

H.     The Administrative Agent is Barred by Laches from Seeking to Exercise Remedies for Alleged Events of Default that Occurred Months Prior ...............................................................................23

III.   THE COMPANY STANDS TO SUFFER IMMEDIATE AND IRREPARABLE HARM IN THE ABSENCE OF A STAY .......................................24

A.     The Bank Lenders' Exercise of Purported Remedies Will Irreparably Harm the Company .........................................................................25

IV.   THE BALANCE OF EQUITIES WEIGHS IN THE COMPANY'S FAVOR ...........28

V.    A PRELIMINARY INJUNCTION IS IN THE PUBLIC INTEREST .......................29

CONCLUSION..........................................................................................................30

iv

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Allied Home Mortgage Corp. v. Donovan*,
  830 F. Supp. 2d 223 (S.D. Tex. 2011) ...................................................................25

*Cartograf, S.A. de C.V. Titus Cargo LLC*, No. 7:20-cv-00095, 2020 WL 3513253
  (S.D. Tex. Apr. 27, 2020) ........................................................................................26

*Daniels Health Sciences, L.L.C. v. Vascular Health Sciences, L.L.C.*,
  710 F.3d 579 (5th Cir. 2013) ..................................................................................25

*Diecidue v. Russo*,
  37 N.Y.S.3d 289 (2d Dep't 2016)......................................................................23, 24

*Dynamic Sports Nutrition, Inc. v. Roberts*,
  No. H-08-1929, 2008 WL 2775007 (S.D. Tex. July 14, 2008) ...............................27

*Emerald City Mgmt., L.L.C. v. Kahn*,
  624 Fed. App'x 223 (5th Cir. 2015) ........................................................................28

*In re Gervin*,
  300 Fed. App'x. 293 (5th Cir. 2008) .......................................................................29

*Glob. Switching, Inc. v. Kasper*,
  No. 06-cv-0412 (CPS), 2006 WL 385315 (E.D.N.Y. Feb. 17, 2006) ....................28

*In re Hidalgo Cty. Emergency Serv. Found.*,
  No. 19-20497, 2020 WL 2029252 (Bankr. S.D. Tex. Apr. 25, 2020) ....................29

*ICEE Distributors, Inc. v. J&J Snack Foods Corp.*,
  325 F.3d 586 (5th Cir. 2003) ..................................................................................15

*ING Real Estate Fin. (USA) LLC v. Park Ave. Hotel Acquisition LLC*,
  No. 601860-2009, 26 Misc. 3d 1226(A) (N.Y. Sup. Ct. Feb. 24, 2010) ................24

*Janvey v. Alguire*,
  647 F.3d 585 (5th Cir. 2011) ..................................................................................25

*In re OGA Charters, LLC*,
  554 B.R. 415 (Bankr. S.D. Tex. 2016) ...............................................14, 25, 28, 29

*Salon Adrian v. CBL & Associates Properties, Inc.*,
    No. 2:16-CV-00206 ................................................................................21, 22

*In re Seatco, Inc.*,
    259 B.R. 279 (N.D. Tex. Feb. 21, 2001).................................................29

*Suchodolski Associates, Inc. v. Cardell Financial Corp*,
    No. 03-cv-4148 (WHP), 2003 WL 22909149 (S.D.N.Y. Dec. 10, 2003) .............................27

*Texas v. United States*,
    328 F. Supp. 3d 662 (S.D. Tex. 2018) ..........................................................15, 28

*Truck Rent-A-Center, Inc. v. Puritan Farms 2nd, Inc.*,
    41 N.Y.2d 420 (1977) .........................................................................24

*In re Yukos Oil Co.*,
    320 B.R. 130 (Bankr. S.D. Tex. 2004) ...................................................14, 25, 29

**Statutes**

11 U.S.C. § 105 ..............................................................................14

11 U.S.C. § 362.................................................................................14

11 U.S.C. § 541..........................................................................14, 15, 29

11 U.S.C. § 7065.................................................................................29

CBL & Associates Properties, Inc. (the "REIT") and its direct and indirect subsidiaries that are debtors and debtors in possession in the above-captioned chapter 11 cases (the "Debtors" and, together with the REIT's non-Debtor direct or indirect subsidiaries "CBL" or the "Company") respectfully submits this Emergency Motion for an Order Granting a Temporary Restraining Order and Preliminary Injunction Enjoining Wells Fargo's Improper Exercise of Remedies.[2]   Through this Motion, CBL respectfully requests that this Court issue an order, pursuant to section 362 of title 11 of the United States Code (the "Bankruptcy Code"), enforcing the automatic stay and enjoining any and all action by Wells Fargo Bank, National Association ("Wells Fargo" or "Administrative Agent"), as administrative agent for a group of secured bank lenders (the "Bank Lenders"), through which it seeks to exercise or enforce any and all remedies as against CBL and/or any of its assets in connection with alleged breaches and/or defaults of the Senior Secured Credit Documents (as defined herein) ("Wells Fargo Action").   To the extent the automatic stay does not apply, CBL respectfully requests that this Court exercise its powers under section 105 of the Bankruptcy Code to preliminarily and permanently enjoin any Wells Fargo Action to allow this Court to retain its exclusive jurisdiction over these Chapter 11 Cases and prevent irreparable harm to CBL, the Debtors' estates, and the reorganizational goals of the Bankruptcy Code.

## PRELIMINARY STATEMENT

In the face of the worst global pandemic in a century that saw the United States record its steepest drop in economic output on record, Wells Fargo has sought to take advantage of this societal and economic upheaval to the severe detriment of CBL.  Relying on baseless allegations of default, Wells Fargo seeks to justify a purported "acceleration" of over $1.1 billion in loans

---

[2] Unless noted otherwise, citations to "Ex. __" refer to the accompanying Declaration of Alfredo R. Pérez.

and the reckless exercise of "remedies" against CBL, including a purported takeover of certain of its assets, including several subsidiaries that are debtors in these Chapter 11 Cases and own the properties that secure the Bank Lenders' loans (the "Credit Facility Properties").  This unauthorized and unlawful exercise of remedies on behalf of the Bank Lenders, if not immediately restrained, would irreparably and severely jeopardize the operations of the Credit Facility Properties and CBL's chances of a successful reorganization.

As COVID-19 began spreading across the country in March, leaving economic turmoil in its wake, shopping mall owners like CBL, many of which had endured a slow downward spiral for years, faced an unprecedented and multifaceted threat to their business with tenants filing for bankruptcy protection at a break-neck pace.  Despite these enormous challenges, CBL worked diligently to ensure that it continued to make every payment to Wells Fargo and comply with the terms of the First Lien Credit Agreement (as defined herein) governing its First Lien Credit Facility (as defined herein) administered by Wells Fargo.  As CBL considered its strategic options, including a chapter 11 restructuring, it in good faith continuously negotiated with its key stakeholders, including Wells Fargo and the Bank Lenders and their advisors, with the goal of reaching a consensual resolution.  Apparently dissatisfied that CBL first reached agreement on a comprehensive restructuring transaction with a group of unsecured bondholders holding in excess of 55% of the Company's unsecured notes, Wells Fargo first sought negotiation leverage against CBL in August 2020 (despite the alleged default having occurred months prior) by calling for the immediate repayment of over $1.1 billion in loans under the guise of meritless alleged defaults under the First Lien Credit Agreement.  It then lay in wait for two additional months until, once again, evidently displeased with a recent offer proposed by the bondholders, it decided to pounce, this time in the form of a purported exercise of "remedies," including

exercising Powers of Attorney to seize control of certain CBL subsidiaries that own the Credit Facility Properties. This included sending nearly 400 letters to over 200 tenants at the Credit Facility Properties directing them to begin paying rent directly to Wells Fargo. Wells Fargo's unlawful conduct has created chaos and confusion for CBL's tenants and forced CBL to file for bankruptcy on an accelerated timeline, and, if not immediately restrained, threatens to jeopardize the success of these Chapter 11 Cases.

Injunctive relief pending adjudication of the issues in dispute is essential here because it will protect CBL from further imminent, irreparable harm—destruction of its business, loss of control of the company, loss of goodwill, and threats to business operations. While this is a matter critical to the successful reorganization of the Company, leaving things as they were before Wells Fargo's precipitous conduct, and what the tenants were used to, until the issues are decided will not impact Wells Fargo or the Bank Lenders for whom it acts, who will be in exactly the same position to pursue remedies if the issues are decided in its favor. This is precisely the type of scenario that warrants injunctive relief.

## FACTUAL BACKGROUND

## I.   CBL'S BUSINESS AND THE FIRST LIEN CREDIT FACILITY

CBL is a self-administered and self-managed real estate investment trust whose stock is traded on the New York Stock Exchange. *See* Declaration of Farzana Khaleel in Support of Debtors' Emergency Motion for Entry of a Temporary Restraining Order and for a Preliminary Injunction ("Khaleel Decl.") ¶ 3. CBL owns, develops, acquires, leases, manages, and operates regional shopping malls, open-air and mixed-use centers, outlet centers, associated centers, community centers, offices, and other properties. *Id.* CBL wholly owns approximately 66 properties, owns joint venture interests in approximately 33 properties, and manages

approximately eight properties.  *Id.*  CBL primarily derives rental revenue from leases from retail and non-retail tenants occupying the aforementioned centers.  *Id.*

In January 2019, the Company entered into a credit agreement (the "First Lien Credit Agreement", and together with the Collateral Agreement and Pledge Agreement, the "Senior Secured Credit Documents") for a new $1.185 billion senior secured credit facility (the "First Lien Credit Facility"), which includes a $685,000,000 revolving credit facility (the "Revolver") and a $500,000,000 term loan.  *Id.* ¶ 4.  The First Lien Credit Facility is secured by a portfolio of approximately 22 properties (the "Credit Facility Properties").  Ex. A at 1, Schedule 1.1(a); Khaleel Decl. ¶ 4.  The First Lien Credit Agreement contains various restrictive covenants including a liquidity covenant (the "Liquidity Covenant"), which provides that aggregate amounts of unrestricted cash of "Cash Equivalents" (a defined term under the First Lien Credit Agreement) that constitute proceeds of the revolving loans may not exceed $100,000,000 at any time.  Ex. A at 109 (Article X, Section 10.1(i)).  The First Lien Credit Agreement also contains default and cross-default provisions.  *Id.* at 115 (Article XI, Section 11.1).

In the case of a valid Event of Default[3] under the First Lien Credit Agreement, the Administrative Agent may accelerate payment of outstanding debt and terminate the First Lien Credit Facility.  *Id.* at 119–20 (Article XI, Section 11.2) (identifying acceleration and termination of facilities as a remedy upon and Event of Default).

Since the effective date of the First Lien Credit Agreement, CBL has continuously complied with all of its obligations thereunder, including without limitation, making payments of interest, amortization and fees of over $130 million, and all other amounts properly due and owing.  Khaleel Decl. ¶ 5.  There have never been, nor are there now, any alleged monetary defaults by the Company with respect to the First Lien Credit Facility.

---

[3] Capitalized terms not defined herein are defined as set forth in the First Lien Credit Agreement.

II.     **CBL'S RESPONSE TO THE COVID-19 CRISIS**

On March 13,[4] President Trump issued an executive order declaring a national emergency in the United States concerning the COVID-19 outbreak.[5]  Countries all over the world closed their borders, and domestically, local governments began enacting preventative measures to defend against the virus.  Such measures included issuing states of emergency, shutting down local businesses, and directing that citizens follow "stay-at-home" orders.  CBL, as the owner of various shopping malls and retail locations, faced substantial hardship.  While prospective customers wisely chose to remain at home to prevent the spread of this deadly virus, retail shopping came to a literal halt.  CBL's tenants faced declining revenues and record numbers filed for bankruptcy, causing substantial losses for CBL.  CBL and its tenants were not alone—the global economy was in a free fall.  The Dow Jones Industrial Average dropped nearly 40% between February and March, echoing the crippling of the economy that occurred during the 2008 global financial crisis.[6]

Like many companies seeking to navigate the economic crisis fueled by the pandemic, in March, CBL faced an urgent need to draw on available lines of credit to procure the liquidity necessary to continue to operate its business.  Khaleel Decl. ¶ 8.  Due to extraordinary market conditions precipitated by the pandemic, over the course of twenty four hours, from late Thursday to late Friday March 19-20, CBL—after delivering the requisite notices to Wells Fargo—drew down $280 million that was available under the First Lien Credit Facility to ensure

---

[4] Unless otherwise noted, the dates stated herein refer to the year 2020.

[5] https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/ (last accessed November 1, 2020).

[6] https://finance.yahoo.com/quote/%5EDJI/history/ (last accessed November 1, 2020) (historical stock prices of the Dow Jones Industrial Average, reflecting a high of $29,568.57 on February 12, 2020, and a low of $18,213.65 on March 23, 2020.)

that it had funds necessary to operate its business and weather this unprecedented storm.  *Id.* ¶ 10.  Aware that a Liquidity Covenant in the First Lien Credit Agreement does not permit CBL to hold unrestricted cash proceeds of the revolving loan under the First Lien Credit Agreement in excess of $100 million at any time (to avoid hoarding of cash), CBL had planned to immediately invest $180 million of the funds in longer term Treasury Notes, as permitted under the First Lien Credit Agreement, so as to be under the threshold.  *Id.*

On Thursday, March 19 at 4:00 p.m. Eastern Time, within an hour of its receipt of approximately $180 million, CBL transferred $100 million of the proceeds to Goldman Sachs ("Goldman"), having previously instructed Goldman to purchase Treasury Notes with a maturity of more than one year.  *Id.* ¶ 11.  Goldman, one of the largest investment banks in the world, indicated that it was unable to open a Treasury Account due to certain regulatory restrictions and required a week to execute on a treasury purchase.  *Id.*  CBL scrambled to find another banker who might be able to execute the transactions and was informed by Jefferies, another investment bank, that it could open an account on an expedited basis and make the investments no later than Monday, March 23. *Id.*  On Friday, March 20, pursuant to the March 17 three-day notice of a $100 draw, CBL received an additional $100 million from the First Lien Credit Facility and within an hour transferred a total of $180 million to Jefferies with the intention of investing these funds in United States Treasury Notes, which would have left CBL with the permitted $100 million in unrestricted cash.  *Id.* ¶ 12.  Because the markets were closed for the day, Jefferies could not start its efforts until the next business day.  *Id.*

On Monday, March 23, Jefferies worked throughout the day trying to purchase Treasury Notes on behalf of CBL but was thwarted by skyrocketing demand in the market.  *Id.* ¶ 13. Every time Jefferies identified a potential option, the treasuries were sold before Jefferies could

buy them.  *Id.*  Given these unprecedented circumstances caused by upheaval in the markets, on Friday, March 20 and again on Monday, March 23, CBL's Executive Vice President – Chief Financial Officer and Treasurer, Farzana Khaleel, contacted Wells Fargo Managing Director Scott Solis—CBL's principal contact at Wells Fargo who had worked with CBL for years—and explained the difficulty CBL was encountering trying to invest the excess cash.  *Id.* ¶ 14.  Mr. Solis acknowledged the challenge created by the market conditions and assured Ms. Khaleel that he understood CBL's difficulties and said that CBL should do its best given the circumstances. *Id.*  Given this assurance, CBL understood that it was not in default and had no expectation that Wells Fargo would subsequently allege default based on these circumstances and call in the billion dollar loan for immediate payment.  *Id.*  On Tuesday, March 24, Jefferies succeeded in investing most of the $180 million by purchasing $154 million in Treasury Notes for CBL.  *Id.* ¶ 15.  CBL deposited the remaining approximately $26 in its account for necessary business expenses.  *Id.*  By April 2, CBL had used the majority of the funds in excess of this amount to cover its operations, service its debts, make its payroll and pay certain taxes and was then in full compliance with the First Lien Credit Agreement.  *Id.*  In other words, it did not hoard the funds but, to the contrary, used them for permitted purposes in order to sustain CBL's business operations.

On March 31, the fiscal quarter closed, and CBL's auditor, Deloitte Touche Tohmatsu Limited ("Deloitte"), began its work on a 10-Q due to be filed on June 5.  *Id.* ¶ 16.  In May, after reviewing CBL's most recent Compliance Certificate, Deloitte advised CBL that notwithstanding the assurances provided by Wells Fargo, CBL should obtain a written waiver to ensure that Wells Fargo would not allege that CBL was non-compliant with the Liquidity Covenant during the few days in question back in March at the height of the market meltdown.

*Id.*  Although believing that no default had occurred, or that any default that may have technically existed was cured or excused by Wells Fargo, on May 15, at Deloitte's recommendation Ms. Khaleel sent an email to Mr. Solis requesting a waiver consistent with their discussion in March.  *Id.* ¶ 17.  Mr. Solis never responded.  *Id.*  Instead, on May 26, over ten days later, notwithstanding its earlier assurances to CBL, and CBL's swift action, Wells Fargo sent CBL a Notice of Default alleging that CBL breached the Liquidity Covenant, breached a related provision regarding the obligation to provide notice of a breach, and failed to timely provide a Compliance Certificate.  *See* Ex. B.

Consistent with Company practice of generally deferring to the auditor's recommendations and taking a conservative approach, at the recommendation of Deloitte in light of the Notice of Default letter, CBL included language in its 10-Q regarding the brief period of alleged non-compliance with the Liquidity Covenant and alleged default that Wells Fargo previously led CBL to believe would not be a basis for action against CBL.  *See* Ex. C at 63; Khaleel Decl. ¶ 18.  On June 9, CBL responded to the Administrative Agent's Notice of Default Letter and disputed the alleged defaults described therein.  *See* Ex. D.

## III.   WELLS FARGO ALLEGES BASELESS DEFAULTS UNDER THE FIRST LIEN CREDIT AGREEMENT

In addition to the purported defaults stemming from the alleged breach of the Liquidity Covenant, Wells Fargo has concocted a laundry list of other alleged defaults, claiming that **(1)** CBL made Restricted Payments (as defined in the First Lien Credit Agreement) in violation of the First Lien Credit Agreement, *see* August 6, 2020 Notice of Additional Defaults (the "August 6 Letter");[7] **(2)** CBL failed to make certain interest payments to other parties, *see* August 6

---

[7] Ex. H.

Letter;[8] **(3)** by allegedly missing two interest payments to other parties and failing to make a payment in connection with an unrelated class action settlement, CBL purportedly violated an Event of Default provision that is triggered if a borrower "generally" does not pay its debts, *see* August 6 Letter;[9] and **(4)** CBL purportedly defaulted under the First Lien Credit Agreement by entering into a Restructuring Support Agreement with certain bondholders, *see* August 19, 2020 Notice of Default (the "August 19 Letter").[10]  CBL responded to each of these letters disputing and refuting the allegations.  Ex. F; Ex. O.  Wells Fargo clearly hopes that by throwing enough alleged defaults at CBL and purporting to assume control of its assets despite lacking any authority to do so, it can force a better deal for itself in CBL's restructuring.  As detailed below, each of these alleged defaults is meritless.  *See infra* at 15–24.

## IV.    GOOD FAITH NEGOTIATIONS WITH STAKEHOLDERS AND THE RESTRUCTURING SUPPORT AGREEMENT

Since May 2020, CBL and its advisors have engaged with an ad hoc group representing the majority of its unsecured bondholders (the "Ad Hoc Bondholder Group") and the Bank Lenders for whom Wells Fargo acts as Administrative Agent and their respective advisors on a comprehensive capital restructuring.  Khaleel Decl. ¶ 23.  In late June and early July, CBL entered into forbearance agreements with the Ad Hoc Bondholder Group with respect to approximately $12 million and $19 million of cash interest payments that came due on June 1 and June 15, respectively, on CBL's unsecured notes.  *Id.*  CBL also entered into a forbearance agreement with the Bank Lenders with respect to a cross-default under the First Lien Credit Facility triggered by the missed interest payments on the notes.  *Id.* ¶ 24.  The forbearance agreements were each extended multiples times by the Ad Hoc Bondholder Group and the Bank

---

[8] Ex. H.
[9] Ex. H.
[10] Ex. K.

Lenders to facilitate further negotiations.  *Id*.  On August 5, prior to the expiration of the forbearance agreements, CBL made the previously missed June 1 and June 15 interest payments on the unsecured notes, resulting in termination of those forbearance agreements.  *Id*.  During and after the forbearance period, negotiations continued with both the Ad Hoc Bondholder Group and the Bank Lenders.  *See id* ¶ 25.

On August 19, CBL advised Wells Fargo, and then announced publicly, that it entered into a restructuring support agreement (the "<u>RSA</u>") with the Ad Hoc Bondholder Group intended to significantly strengthen its balance sheet and organization.  *Id.* ¶ 26.  Included in Wells Fargo's laundry list of claims is the incorrect assertion that entering into the RSA constituted an Event of Default.  *See* Ex. K at 2.

## V.    WELLS FARGO ISSUES NOTICE OF ACCELERATION BASED ON MERITLESS ALLEGATIONS OF DEFAULT

As soon as Wells Fargo learned that CBL had reached a deal with the Ad Hoc Bondholder Group, it pulled the trigger and launched its Notice of Acceleration on August 19, demanding immediate accelerated payment of over $1.1 billion and terminating certain credit commitments provided for in the First Lien Credit Agreement.  Ex. E.  Indeed, the ink on the RSA between CBL and the Ad Hoc Bondholder Group had hardly dried before Wells Fargo served the Notice of Acceleration on CBL.  Having sat quietly for months, Wells Fargo's sudden move to claim entitlement to a draconian remedy against CBL immediately after it had reached an agreement with another constituency of stakeholders was a naked attempt to gain leverage at the negotiating table that recklessly and needlessly put CBL in imminent peril.  *See* Khaleel Decl. ¶¶ 27–28, 31.

The Notice of Acceleration also carried with it the threat of other enforcement remedies, including (i) a purported takeover of the Board of Directors of certain CBL subsidiaries; (ii) the

immediate appointment of a receiver "without notice of any kind whatsoever;" (iii) the exercise all voting powers pertaining to the pledged collateral and the right to sell CBL's equity and (iv) revoking rights to collect rents and revenues. *Id.* ¶ 32.   Acceleration also threatened to impact other loan agreements CBL has with third parties.   *Id.* ¶ 33.   For example, provisions in the Company's Senior Unsecured Notes authorize cross-default upon acceleration or certain defaults on loans with other lenders. *Id.*   In addition, a number of property level loan agreements contain cross-default provisions that are triggered upon an acceleration and which provide those other lenders remedies against CBL, including foreclosure on the Credit Facility Properties. *Id.* ¶ 34.

CBL immediately responded to the Notice of Acceleration disputing its efficacy and requesting that the Administrative Agent rescind the notice immediately.   Ex. F.  CBL expressed its interest in continuing to work with the Bank Lenders cooperatively to negotiate a resolution in good faith, while simultaneously allowing all parties to reserve their rights.  *See id.*   Although the Administrative Agent refused to rescind the Notice of Acceleration, it again went into hibernation.  *See* Ex. G.

## VI.   WELLS FARGO PURPORTS TO EXERCISE REMEDIES, FORCING CBL INTO AN IMMEDIATE CHAPTER 11 FILING

Notwithstanding the Notice of Acceleration, which was issued erroneously and in bad faith, CBL has continuously engaged with the Bank Lenders in good faith and has stated publicly that it intends to continue collaborative negotiation to reach consensus among its stakeholders. *See* Khaleel Decl. ¶ 36; August 19, 2020 – RSA Press Release (available at https://www.cblproperties.com/restructuring).   Upon executing the RSA, the Company and the Ad Hoc Bondholder Group focused their efforts on negotiations with the Bank Lenders in an effort to reach a tripartite agreement among the Company, the Ad Hoc Bondholder Group and the Bank Lenders over the terms of a fully consensual restructuring.  Khaleel Decl. ¶ 36.  In fact,

despite wrongfully using the Notice of Acceleration as a negotiation tactic, Wells Fargo continued to negotiate with CBL on a potential global resolution and gave no indication that it would seek to enforce any of the remedies it claimed it had. *Id.* ¶ 35.

On October 13, 2020, the members of the Ad Hoc Bondholder Group executed confidentiality agreements and became "restricted" to negotiate directly with the Bank Lenders. *Id.* ¶ 37. On October 27, 2020, the Ad Hoc Bondholder Group's advisors sent a restructuring term sheet to the Administrative Agent's advisors that the Bank Lenders apparently found offensive. *Id.* Instead of responding with a counterproposal, under cover of darkness, the Bank Lenders abruptly cut short the negotiation process and purported to exercise remedies, including proxy rights, to take control of the Credit Facility Properties and implement governance changes at certain of the REIT's subsidiaries that own the Credit Facility Properties. *Id.* ¶ 37. The timing of Wells Fargo's Notice of Acceleration and Notice of Exercise of Remedies makes clear that it is acting in bad faith and using these tactics to pressure CBL in restructuring negotiations.

Specifically, on October 28, 2020 and with no prior notice—despite the fact that over seven months had passed since the alleged defaults and over two months had passed since the Administrative Agent sent the Notice of Acceleration—the Company received a number of documents from the Administrative Agent, including 1) a Notice of Exercise of Remedies (*see* Khaleel Decl. Ex. A) under the Collateral Agreement[11] and the Pledge Agreement[12], 2) a Revocation of License to Collect Rents (*see* Khaleel Decl. Ex. B), 3) Joint Written Consents for multiple of the Company's subsidiaries which own the Credit Facility Properties purporting to take a number of actions, including transitioning leadership of those entities to Wells Fargo (*see* Khaleel Decl. Ex. C), and 4) over 400 Tenant Direction Letters purporting to direct tenants of the

---

[11] *See* Ex. N.
[12] *See* Ex. L.

Credit Facility Properties, effective immediately, to stop paying rent to CBL's subsidiaries which own and operate those Credit Facility Properties and instead to pay rent directly to the Administrative Agent (*see* Khaleel Decl. Ex. D).

The malls still of course need to be operated and CBL needs the rents to pay for those operations.  Khaleel Decl. ¶ 42.  But Wells Fargo's letters make no accommodation for those operational expenses or for the fact that someone has to actually operate the properties.  *Id.*  Wells Fargo clearly did not think things through before it acted in anger.

Those notices stated, among other things, that the Administrative Agent purportedly was (i) electing to exercise all voting rights and all other ownership rights in respect of all Credit Facility Properties; (ii) revoking the Company's right to collect rents and that the Company had three (3) days to instruct its tenants to pay rent directly to the Administrative Agent; and (iii) removing the manager and officers from the governing boards of the Credit Facility Properties and appointing itself as manager via a joint written consent. *Id.* ¶ 39.  Most ominously, the joint written consents purport to strip the governing boards of the Credit Facility Properties of the authority to file any bankruptcy petition without the consent of the Administrative Agent thereby exposing the Company—and its collective creditors—to the mercy of the Bank Lenders. *Id.*

This unfortunate development left the Company no choice but to commence these Chapter 11 Cases on an accelerated timeline to protect the Company, its stakeholders and its properties.  *Id.* ¶ 43.  While the Company intended to have a deliberate and thoughtful entry into chapter 11, it was left to scramble for an emergency filing over a weekend due to the entirely unlawful, unnecessary, and unprovoked conduct of the Administrative Agent. *See id.*

# ARGUMENT

## I.  INJUNCTIVE RELIEF AGAINST WELLS FARGO IS APPROPRIATE

The automatic stay prohibits "all entities" from taking any "act" to "exercise control over property of the estate."  11 U.S.C. § 362(a)(3).  For the reasons set forth herein, the Credit Facility Properties and rental incomes derived therefrom are "property of the estate."  *See* 11 U.S.C. § 541.  Given Wells Fargo's contention that it now owns the Credit Facility Properties, the Court should issue an order enforcing the automatic stay and making plain that Wells Fargo (and those for which it acts) is enjoined from exercising control over the Credit Facility Properties, at least until the pendency of this adversary proceeding.

An injunction is also appropriate under section 105 of the Bankruptcy Code, under which the Court may "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).  "A preliminary injunction seeks to 'prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits.'"  *In re OGA Charters, LLC*, 554 B.R. 415, 424 (Bankr. S.D. Tex. 2016) (quoting *Miss. Power & Light Co. v. United Gas Pipe Line*, 760 F.2d 618, 621 (5th Cir. 1985)).  This Court has the power to issue a temporary restraining order and preliminary injunction pursuant to 11 U.S.C. § 105(a), and in making that determination "must consider the traditional inquiries which have a bearing on preliminary injunctions issued pursuant to [Fed. R. Civ. P.] 65." *In re Yukos Oil Co.*, 320 B.R. 130, 135 (Bankr. S.D. Tex. 2004) (citing *Feld v. Zale Corp.*, 62 F.3d 746 (5th Cir. 1995)).  To obtain such relief, a party seeking a preliminary injunction "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of a preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."  *In re OGA Charters*, 554 B.R. at 424 (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  If a plaintiff is able to show

that it has a "strong likelihood" to meet, either, the success on the merits prong or the irreparable harm prong, "then the opposite factor may be subject to a lower standard." *Id.* at 424–25 (quoting *Canal Authority of State of Fla. v. Callaway*, 489 F.2d 567, 576–77 (5th Cir. 1974)).

## II.    CBL IS LIKELY TO SUCCEED ON THE MERITS

A plaintiff must only "show a likelihood of success on the merits rather than actual success" to be successful in a preliminary injunction. *ICEE Distributors, Inc. v. J&J Snack Foods Corp.*, 325 F.3d 586, 596 n.34 (5th Cir. 2003) (quoting *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12 (1987)).  To do so, "the plaintiff must present a prima facie case but need not show a certainty of winning."  *Texas v. United States*, 328 F. Supp. 3d 662, 710 (S.D. Tex. 2018) (internal citations omitted).

Here, CBL is likely to succeed on the merits because each of the Administrative Agent's claims of default on which it bases its Notice of Acceleration and purported exercise of remedies relies on a misreading or flawed interpretation of the First Lien Credit Agreement and/or misapprehension of the facts and therefore lacks any legal foundation.  The Bank Lenders have no authority to exercise any remedies against CBL or its assets, which remain property of the Debtors' estate. *See* 11 U.S.C. § 541(a).

### A.    CBL did not default on the First Lien Credit Agreement's Liquidity Covenant

Wells Fargo alleges that CBL breached the Liquidity Covenant of the First Lien Credit Agreement by allowing aggregate unrestricted cash drawn from the First Lien Credit Facility to exceed $100 million.  *See, e.g.,* Ex. B.  But, as discussed above, CBL purchased the necessary investments following its draws on March 19 and 20 as soon as the unprecedented market volatility permitted.  Khaleel Decl. ¶¶ 10–12.  Furthermore, when the difficulty of placing the cash in two-year Treasury Notes became apparent, even for the likes of Goldman, CBL

immediately notified Wells Fargo and was led to believe that Wells Fargo understood that there was no default. *Id.* ¶ 14. CBL did not hold cash in excess of the $100 million threshold to the detriment of Wells Fargo and was not hoarding cash—which is the reason the covenant exists in the first place. *Id.* ¶ 15. Rather, CBL was lifting heaven and earth to find, and ultimately very quickly found, investments that satisfied the covenant and otherwise—within days—used funds for the precise purpose for which they were intended: to sustain its essential business operations. *Id.*

Although CBL's June 5 10-Q referenced a default of the Liquidity Covenant, which Wells Fargo no doubt will repeatedly reference, Deloitte recommended that CBL include this language because Wells Fargo had served a Notice of Default. *Id.* ¶ 18. The 10-Q in no way reflects CBL's agreement with the claims alleged in the Notice. *Id.* As clearly stated just a few days later in its letter response to the Notice of Default, CBL disputes it breached the Liquidity Covenant. *See* Ex. D.

### B. CBL did not default by failing to provide notice regarding a purported breach of the Liquidity Covenant

Wells Fargo has further alleged that CBL's failure to provide notice of the alleged breach of the Liquidity Covenant constitutes an independent default. *See* Ex. B at 2. Section 9.4(j)(i) of the First Lien Credit Agreement requires "prompt notice of the occurrence of any Default of Event of Default." Ex. A at 9.4(j)(i). However, as discussed above, CBL promptly notified the Administrative Agent that CBL was having difficulty securing long-term investments for money it had drawn, and the Administrative Agent assured CBL that it should simply do its best to place the investment. Khaleel Decl. ¶ 14. Wells Fargo has no legitimate basis for claiming that CBL is in breach of this notice provision.

C.      **CBL did not make Restricted Payments in violation of the First Lien Credit Agreement**

Wells Fargo also alleges that CBL made certain Restricted Payments, as defined in the First Lien Credit Agreement, in contravention of that agreement.  *See* Ex. H at 1.  Wells Fargo is wrong.  Indeed, Wells Fargo's claim is premised entirely on the irrational argument that CBL's payment of standard dividends, which it has made in the exact same fashion for years, suddenly constitutes a breach of the First Lien Credit Agreement.  Khaleel Decl. ¶ 29.

Pursuant to Section 10.1(k)(ii) of the First Lien Credit Agreement:

> *"So long as no Default or Event of Default exists or would result therefrom, the Borrower may pay cash dividends to the Parent and other holders of partnership interests in the Borrower with respect to any fiscal year ending during the term of this Agreement to the extent necessary for the Parent to distribute, and the Parent may so distribute, cash dividends to its shareholders in an aggregate amount not to exceed the greater of (x) the amount required to be distributed for the Parent to remain in compliance with Section 8.12. or (y) ninety-five percent (95%) of Funds From Operations."* Ex. A at 10.1(k)(ii).

First, no Default or Event of Default existed at the time of making such Restricted Payments.  Second, even to the extent one did exist, the clear intent of this provision is to permit CBL to make (i) any Restricted Payments so as to maintain its real estate investment trust status and (ii) any additional Restricted Payments utilizing the 95% of FFO basket.  The language "to the extent necessary" speaks only to the Restricted Payment required to be made between CBL and the REIT (CBL's "Parent") in order for the REIT to make the Restricted Payments permitted by the provision.  To that point, the provision permits CBL to pay cash dividends directly to holders of partnership interests in CBL.  As such, the language "to the extent necessary" does not qualify the entirety of the provision.  A conclusion that Restricted Payments using the 95% of FFO basket may only be made "if necessary" is a clear misreading of the provision — and also inconsistent with market convention for similar First Lien Credit Agreements.

Moreover, the same Restricted Payments provision has been included in prior iterations of credit facilities between CBL and Wells Fargo since at least November 2012, and CBL has not altered the method in which payments have been made to the Parent and other holders of partnership interests in CBL during this period.  Khaleel Decl. ¶ 29.  Notwithstanding this known practice, and the fact that the First Lien Credit Facility was renewed in January 2019, Wells Fargo has never before made any mention, let alone objection or contention, that any such Restricted Payments made pursuant to this provision violated the First Lien Credit Agreement. Presumably if Wells Fargo had an issue with this practice, it would have said something in the context of the renewal just last year.  *Id.*

### D.     CBL's purported default related to certain interest payments was waived by Wells Fargo Under the Forbearance Agreement

Wells Fargo further alleges that CBL is in default of the First Lien Credit Agreement for its failure to make certain interest payments *to other parties*—the unsecured bondholders—that were due in June.  *See* Ex. H at 3.  This argument ignores the critical fact that CBL has since made the payments in full, thus curing any alleged default, and that Wells Fargo entered into a Forbearance Agreement that included a provision waiving any such Event of Default to the extent that either (1) CBL obtained a waiver of such payment default from the trustee for the bondholders, or (2) CBL pays the missed interest payments and as a result thereof the notes could be not be accelerated in accordance with the terms of the indenture.  Khaleel Decl. ¶ 24; Ex. I at 3.

The Administrative Agent asserts that the conditions of waiver were not satisfied "because, among other reasons, such payment defaults have not been waived by the trustee under the 5.95% Senior Unsecured Notes and the 5.25% Senior Unsecured Notes <u>and</u> further, can still be cause for acceleration under the terms of the applicable indentures."  *See* Ex. H at 2.   But, as

Wells Fargo is well-aware, the alleged default on the First Lien Credit Facility was waived upon the payment of the applicable interest payments, as a result of which the bondholders explicitly agreed to "rescind and cancel any such acceleration."  *See* Ex. M at Section 4.03.  In addition, pursuant to Section 502 of the indenture governing the Senior Unsecured Notes, the trustee or holders of not less than 25% in aggregate principal amount of the applicable series of Senior Unsecured Notes may only accelerate such notes if an event of default has occurred "and is continuing."  *See* Ex. J at 45.

The subsequent payment of the relevant interest payments on the Senior Unsecured Notes on August 5 cured any prior Event of Default related thereto, and the bondholders have acknowledged that the Events of Default related to the June payments "are no longer continuing."  *See* Ex. M at Section 4.03.  Accordingly, pursuant to the plain meaning of Section 502 of the indenture governing the Senior Unsecured Notes, neither the trustee nor the holders of Senior Unsecured Notes have any right to accelerate the applicable Senior Unsecured Notes.

Moreover, even if some bondholders or the trustee on the Senior Unsecured Notes might claim an acceleration—none have—the bondholders who are parties to the RSA consist of more than a majority in aggregate principal amount of each of the Senior Unsecured Notes and have agreed in the RSA to direct the trustee to rescind any acceleration of the applicable Senior Unsecured Notes arising from the prior Event of Default relating to the interest payments to the extent any may be attempted.  *See* Ex. M at Section 4.03.

Given that the missed interest payments have been cured and that the parties who were owed the money are not claiming a default, Wells Fargo's claim that the delayed payments to these other parties constitute an Event of Default that can serve as the basis for its Notice of Acceleration is meritless.

E.     **The Administrative Agent erroneously claims that CBL has "generally not pa[id] its debts as such debts become due."**

The Administrative Agent has alleged that CBL is in default of the First Lien Credit Agreement under Section 11.1(e)(B), which states that it shall be an Event of Default if CBL "shall generally not pay its debt as such debts become due."  *See* Ex. H at 2; *See* Ex. A at 11.1(e)(B).  The Administrative Agent points to *two* instances of alleged payments not being made to support its contention that CBL "generally" does not pay its debts.  Even if the allegations were true, which they are not, they come nowhere close to satisfying the standard contemplated by this provision.

Wells Fargo points to the missed interest payments (the "Noteholder Payments") as purported evidence that CBL has not been paying its debts as they come due.  That, however, does not constitute a failure to "generally" pay its debts as such debts become due.  A failure to make certain, limited payments, including the Noteholder Payments, is covered by the "Cross-Default" provision in Section 11.1(d) of the First Lien Credit Agreement. *See* Ex. A at 11.1(d). The question of whether a borrower has "generally not pa[id] its debts as such debts become due," on the other hand, is intended to be a test for determining insolvency, which is why it is included as a prong in the Event of Default section entitled  "Voluntary Bankruptcy Proceeding" under Section 11.1(e)(B) of the First Lien Credit Agreement.  *Id.*   That provision has no application to this alleged default.

Moreover, the timing of the applicable interest payments under the Senior Unsecured Notes was a product of discussions with both the Ad Hoc Bondholder Group and the Administrative Agent leading up to, and contemplated by, the Forbearance Agreement, the sole purpose of which was to grant a forbearance with respect to any Events of Default caused by the Notes Payment Default.  Khaleel Decl. ¶ 24.  To that end, the Forbearance Agreement referenced

only the Event of Default under Section 11.1(d), namely, the "Cross Default." *See* Ex. I at 2.  At no time during such discussions, or otherwise, did Wells Fargo assert that the Noteholder Payments triggered an Event of Default under the First Lien Credit Agreement other than that specifically relating to the cross Event of Default under Section 11.1(d). *See* Ex. A at 11.1(d).

Further, as discussed above, pursuant to the terms of the Forbearance Agreement, given that  CBL subsequently paid the applicable missed interest payments, such payment resulted in a waiver by the Bank Lenders of the cross Event of Default under the First Lien Credit Agreement. It is undisputed that the Company made the interest payments on August 5.  Thus, Wells Fargo is attempting to assert an Event of Default relating to the late interest payments *after the payments were made*.  This smacks of bad faith.

The Administrative Agent also asserts that CBL has "generally not paid its debts as such debts become due" because CBL allegedly did not make a settlement payment in connection with an action in Florida (the "Salon Adrian Case").  *See* Ex. H at 2.  Yet, there could be no Event of Default in the Salon Adrian Case, *Salon Adrian v. CBL & Associates Properties, Inc.*, No. 2:16-CV-00206, M.D. Fla. (Mar. 16, 2016), because there was no specific time when payments were due under the applicable settlement agreement.  The only "documents filed" in the Salon Adrian Case since the filing of the settlement agreement is a motion entitled "*The Class' Expedited Motion to Enforce the Settlement Agreement*," filed on March 30 ("March 30 Motion").  *Id.* at Dkt. 341.

While the Administrative Agent relies on the March 30 Motion for its allegations of default, this was nothing more than a demand by the plaintiffs for the Court to set dates for certain payments referenced in a settlement agreement.  And, most significantly, Wells Fargo—either intentionally or negligently—failed to note that the March 30 Motion was voluntarily

withdrawn by the plaintiffs that very same day it was filed. *Id.* at Dkt. 342. Moreover, all payments previously required of CBL under the settlement agreement in the Salon Adrian Case have been timely made and there has been no notice of any default received by CBL, nor any default by CBL, under that agreement. The Administrative Agent's assertion that CBL has defaulted under the referenced settlement agreement is baseless.

**F.    CBL did not fail to timely provide the Administrative Agent with a compliance certificate**

Adding to the list, Wells Fargo also wrongfully alleges that CBL failed to provide it with a compliance certificate by May 22, as required under the First Lien Credit Agreement. *See* Ex. B at 2. In fact, CBL provided Wells Fargo with its compliance certificate on May 18. Indeed, CBL has timely provided Wells Fargo with compliance certificates as a matter of course throughout the term of the First Lien Credit Agreement, as well as under prior First Lien Credit Agreements with the Administrative Agent. This allegation of breach is, therefore, also groundless.

**G.    CBL did not default on the First Lien Credit Agreement when it entered into a Restructuring Support Agreement with certain bondholders**

Finally, in retaliation for CBL reaching an agreement with the Ad Hoc Bondholder Group, Wells Fargo has alleged that the RSA with the Ad Hoc Bondholder Group constitutes an event of default. According to Wells Fargo, because the RSA contemplates a potential Chapter 11 filing, it violates Section 11.1(e)(A)(vii) of the First Lien Credit Agreement. *See* Ex. K at 2; *See* Ex. A at 11.1(e)(A)(vii).

The relevant provision of the First Lien Credit Agreement provides for the occurrence of an Event of Default upon:

**(e) Voluntary Bankruptcy Proceeding. (A) The Borrower, the Parent, any Loan Party or any other Significant Subsidiary shall:** (i) **commence a voluntary case under the Bankruptcy Code or other federal bankruptcy laws**

22

**(as now or hereafter in effect)**;… or **(viii) take any corporate, partnership or similar action for the purpose of effecting any of the foregoing** or (B) the Borrower, the Parent, any other Loan Party or any other Significant Subsidiary shall generally not pay its debts as such debts become due.

Ex. A at 11.1(e)(A)(vii). (emphasis added).

CBL's entering into the RSA was not, and cannot be, deemed an Event of Default under the First Lien Credit Agreement, and the Administrative Agent's August 19 Letter fails to allege with any indicia of specificity how entering into the RSA violates this provision.  As CBL previously explained to the Administrative Agent, "the Board of Directors of CBL must have a separate vote to decide whether CBL may commence any potential Chapter 11 case, and [] specifically noted in the agreement that the Board of Directors of [CBL] has made no such authorization."  *See* Ex. F.  The RSA was simply an agreement with certain bondholders that may be used not only in a bankruptcy context, but for further negotiations pertaining to CBL's debt profile.  While the RSA did contemplate a potential chapter 11 filing, nothing required a filing.  Accordingly, CBL's execution of the RSA in no way constituted an action "for the purpose of effecting" a voluntary bankruptcy filing, and the Administrative Agent's allegation of default is meritless.

### H.   The Administrative Agent is Barred by Laches from Seeking to Exercise Remedies for Alleged Events of Default that Occurred Months Prior

Even if the Administrative Agent could establish that an Event of Default occurred— which it cannot—it would be barred from asserting any claim under the First Lien Credit Agreement by laches. A party is barred from enforcing "a right where there has been an unreasonable and inexcusable delay that results in prejudice to a party." *Diecidue v. Russo*, 37 N.Y.S.3d 289, 291 (2d Dep't 2016) (internal citations omitted).[13]   To make a showing of

---

[13] The First Lien Credit Agreement is governed by New York law. *See* Ex. A at 13.13.

prejudice due to delay, a party may demonstrate "injury, change of position, loss of evidence, or some other disadvantage resulting from the delay." *Id.* at 292 (internal citations omitted).

Here, after the Administrative Agent notified CBL of the alleged Events of Default, which the Company promptly disputed, it did not take any measures to act upon these purported breaches for months. Allowing a party to sit on a claim until an opportune moment arises to seek leverage against its counterparty represents an act of pure gamesmanship that clearly constitutes "an unreasonable and inexcusable delay." Despite the Administrative Agent's bad faith Notice of Acceleration and the dire situation caused by the national economic crisis, CBL continued to act diligently and make all required payments under the First Lien Credit Agreement. The Bank Lenders now seek to enforce remedies for alleged non-monetary Events of Default that occurred several months ago merely to gain advantages in the pending bankruptcy and deplete the Debtors' estate for their personal gain.

And of course, it would make no sense that the Administrative Agent should call the entire amount due and take over the Credit Facility Properties for something that even if a technical violation for a few days was quickly remedied and caused no harm to the lenders. *E.g.*, *Truck Rent-A-Center, Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 425 (1977); *ING Real Estate Fin. (USA) LLC v. Park Ave. Hotel Acquisition LLC*, No. 601860-2009, 26 Misc. 3d 1226(A), at *5 (N.Y. Sup. Ct. Feb. 24, 2010).

## III.    THE COMPANY STANDS TO SUFFER IMMEDIATE AND IRREPARABLE HARM IN THE ABSENCE OF A STAY

Even if the likelihood of success factor were close, which it is not and strongly favors CBL, the severe irreparable harm that will befall CBL here supports granting the requested injunctive relief.

Irreparable harm is an injury "for which there is no adequate remedy at law" that is not speculative or remote, but actual and imminent. *See Daniels Health Sciences, L.L.C. v. Vascular Health Sciences, L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013); *Allied Home Mortgage Corp. v. Donovan*, 830 F. Supp. 2d 223, 227 (S.D. Tex. 2011). Moreover, "the mere fact that economic damages may be available does not always mean that a remedy at law is 'adequate.'" *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011); *see also In re OGA Charters*, 554 B.R. at 424–25.

The global pandemic has had a chilling effect on the economy at large and the Company—a publicly traded real estate investment trust that owns, develops, acquires, manages, and operates regional shopping malls and other properties—saw a steep decline in business. Khaleel Decl. ¶¶ 3, 6. Adding insult to injury, after years of faithful payments and a successful working relationship, Wells Fargo's purported exercise of extreme remedies in connection with a baseless purported acceleration of more than $1.1 billion of debt now threatens to deliver a swift and potentially fatal blow to the Company's operations and chances of a successful reorganization to weather the storm. Rather than working with CBL, Wells Fargo has instead gone directly to hundreds of CBL's tenants at numerous malls around the country and sewn confusion not only on who they should pay but who, if anyone, is in charge.

### A.    The Bank Lenders' Exercise of Purported Remedies Will Irreparably Harm the Company

The Bank Lender's purported exercise of unauthorized and unlawful "remedies" against CBL will irreparably harm the Company before the "merits" of Wells Fargo's allegations can be adjudicated. The Company is therefore entitled to a temporary restraining order that will leave things where they were before the Administrative Agent's precipitous actions so that these matters can be worked out by the Court will little to no impact on the tenants and the operations of the Credit Facility Properties. *See In re Yukos Oil Co.*, 320 B.R. at 136–37 (granting

temporary restraining order to prevent defendants from proceeding with the irreversible sale of debtor's interest in a subsidiary that produced sixty percent of the debtor's oil and gas production for half its value where "there [was] no evidence of harm" to the defendants from a delayed sale).

The Bank Lenders' recent actions through the Administrative Agent have, and, if not immediately enjoined, will continue, to create chaos and confusion, including among the tenants that occupy these Credit Facility Properties, many of which have already contacted the Company for guidance as to how to proceed and to which entity to make payment. Khaleel Decl. ¶ 40. As would be expected given this willful and malicious conduct on the part of the Administrative Agent, the interference with the Company's business relationships and contracts with its counterparties will be severe and significant if not enjoined. Indeed, the Bank Lenders' actions pose dire consequences to the Company's ability to maximize liquidity and protect the people— vendors, employees, and retailers—who rely on the Company's stability. *See Cartograf, S.A. de C.V. Titus Cargo LLC*, No. 7:20-cv-00095, 2020 WL 3513253, at *1 (S.D. Tex. Apr. 27, 2020) (issuing temporary restraining order where plaintiff would lose existing orders and the business of customers on a long-term basis, which "cannot be adequately calculated in simple economic damages related to a single transaction").

These actions are not only value destructive to the Credit Facility Properties but to the Company's enterprise as a whole as they are extremely disruptive to the operations of the Credit Facility Properties, including with respect to application of rents, collection of rents, cutting off vital funds to pay operating expenses and capital and emergency items, and disrupting the Company's ongoing negotiations with tenants. *Id.* ¶ 41. Because of the tumultuous impact of the pandemic on mall tenants, the Company has worked tirelessly to negotiate solutions, including

through rent abatements and deferrals, to preserve its operations. *Id.* These efforts will be severely and adversely impacted by the Bank Lenders' actions and will cause the Company irreparable damage through its negative impact on the Company's good will and business relationship with its tenants and suppliers and the uncertainty it creates with respect to the ongoing operations of the Credit Facility Properties, which are already suffering from the tumultuous impact of the pandemic and negative economic climate. *Id.*; *see Dynamic Sports Nutrition, Inc. v. Roberts*, No. H-08-1929, 2008 WL 2775007, at *1–*2 (S.D. Tex. July 14, 2008) (granting preliminary injunction where plaintiff established irreparable harm from the potential "loss of clients, goodwill, revenues and profits").

Significantly, for example, the malls and other properties at issue have to still be operated by the Company's subsidiaries, and those operations cost money. *Id.* ¶ 42. The rents from tenants are the principle source of funding for those operations, yet the Administrative Agent has made no accommodation for providing funds for the operations. *Id.* This is particularly problematic at the Pearland Town Center in Pearland, Texas where there is currently being constructed a medical office building. *Id.* Rents from tenants at the Pearland Town Center are required so that the construction company working on the project gets paid. Through its actions, the Administrative Agent has put that construction in jeopardy. *Id.*

In fact, the Bank Lenders conduct has left the Company no choice but to commence these Chapter 11 Cases on an accelerated timeline to protect the Company and its stakeholders. *Id.* ¶ 43. If not immediately restrained, the Administrative Agent's continued unauthorized exercise of remedies on behalf of the Bank Lenders will jeopardize the operations of the First Lien Credit Facility Properties as well as the success of these Chapter 11 Cases. *Id.* This wrongful loss of control constitutes irreparable harm. *See Suchodolski Associates, Inc. v. Cardell Financial Corp*,

No. 03-cv-4148 (WHP), 2003 WL 22909149, at *4 (S.D.N.Y. Dec. 10, 2003) ("[A] party's loss of control of a business constitutes[] irreparable harm."); *Glob. Switching, Inc. v. Kasper,* No. 06-cv-0412 (CPS), 2006 WL 385315, at *3 (E.D.N.Y. Feb. 17, 2006) (same); *cf. Emerald City Mgmt., L.L.C. v. Kahn*, 624 Fed. App'x 223, 224–25 (5th Cir. 2015) (affirming finding of irreparable harm where loss of control of trademark name would lead to lose of control of the trademark's reputation and goodwill).

## IV.    THE BALANCE OF EQUITIES WEIGHS IN THE COMPANY'S FAVOR

The balance of equities overwhelmingly favors CBL.   In considering a preliminary injunction, a court must "balance the competing claims of injury and . . . consider the effect of each on each party of the granting or withholding of the requested relief." *Texas*, 328 F. Supp. 3d at 740 (quoting *Amoco*, 480 U.S. at 42); *see also In re OGA Charters*, 554 B.R. at 431 (noting that the "the analysis focuses on the degree to which each party will be harmed if a preliminary injunction should be entered and whether, in consideration of those harms, the harm of one party outweighs another").

In the context of a global pandemic, CBL has worked to protect the Company—including its employees (approximately 500), vendors (thousands), and tenants/retailers (over 7,400)—by preserving and maximizing liquidity.   Khaleel Decl. ¶ 7.   The First Lien Credit Facility played an important role in this effort, allowing CBL to access short-term financing and stay afloat in the middle of an unprecedented public health crisis that had a particularly harsh impact on the Company's business.   *Id*.   Despite these challenges, CBL has steadfastly honored the terms of the First Lien Credit Agreement and stayed true to its spotless record of timely payment.   *Id*. Unfortunately, rather than respect the Company's diligent efforts, Wells Fargo has decided to exploit baseless claims and pursue draconian remedies, which have forced the Company into a precipitous bankruptcy.   Absent injunctive relief, the Company, its employees, retailers, and

vendors will suffer immeasurably before the Court even has the opportunity to adjudicate the issues in dispute.

In stark contrast, if the injunction issues, Wells Fargo will suffer no harm as none of the alleged Events of Default was monetary or even allegedly resulted in non-payment.[14]   Indeed, the Credit Facility Properties securing the loans administered by Wells Fargo will continue to secure the loans (the properties are not going anywhere), and if Wells Fargo were to ultimately prevail, it will be able to exercise remedies from the exact same position.  *Id.* ¶ 5.  In this context, and in light of the foregoing, the equities favor CBL and warrant relief.  *See In re Yukos Oil Co.*, 320 B.R. at 137 (holding that the balancing of equities fell in favor of the debtor who stood to lose its primary asset while defendant would suffer no harm from the issuance of the temporary restraining order).

## V.        A PRELIMINARY INJUNCTION IS IN THE PUBLIC INTEREST

A preliminary injunction preserving the status quo and protecting the Company's assets is clearly in the public interest.   "In bankruptcy, the public policy is to have an orderly administration of the debtor's assets via their bankruptcy estate, such that the debtor may be able to gain a fresh start, by satisfying valid claims against that estate." *In re OGA Charters*, 554 B.R. at 426. Therefore, it is in the public interest to prevent "the dissipation of potential assets belong to the debtor that, pursuant to 11 U.S.C. § 541, may be brought into the bankruptcy estate . . . ." *Id.*  Here, the Bank Lenders' conduct—an unauthorized and unlawful attempt at seizing control over assets of CBL, including its continuing revenue sources in the form of tenant rents—plainly threatens to diminish the estate assets.  The Bank Lenders' conduct is already creating chaos,

---

[14] Under the Bankruptcy Code, plaintiffs, as debtors, are not required to post bond for preliminary injunctive relief. 11 U.S.C. § 7065 (stating that a "temporary restraining order or preliminary injunction may be issued on application of a debtor . . . without compliance with [Fed. R. Civ. P.] 65(c)"); *see also In re Gervin*, 300 Fed. App'x. 293 (5th Cir. 2008); *In re Hidalgo Cty. Emergency Serv. Found.*, No. 19-20497, 2020 WL 2029252, at *2 (Bankr. S.D. Tex. Apr. 25, 2020); *In re Seatco, Inc.*, 259 B.R. 279 (N.D. Tex. Feb. 21, 2001) (collecting cases).

confusion, disrupted operations, and diminished goodwill, all of which clearly hinders the public policy of an orderly administration of the Debtors' assets in these Chapter 11 Cases.

## CONCLUSION

For the foregoing reasons, Wells Fargo (and those for whom it acts) should be immediately enjoined from taking any action to exercise or enforce any and all remedies under the Senior Secured Credit Documents, or any other relevant agreement, as a result of the alleged events of default. A temporary restraining order should issue pending resolution of this motion.

Dated: November 2, 2020
      Houston, Texas

Respectfully submitted,

  */s/  Alfredo R. Pérez*
WEIL, GOTSHAL & MANGES LLP
Alfredo R. Pérez (15776275)
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email:   Alfredo.Pérez@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Theodore E. Tsekerides (*pro hac vice* pending)
Ray C. Schrock, P.C. (*pro hac vice* pending)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:   Theodore.Tsekerides@weil.com
      Ray.Schrock@weil.com

*Proposed Attorneys for Debtors*

## **Certificate of Service**

I hereby certify that a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas, and will be served as set forth in the Affidavit of Service to be filed by the Debtors' proposed claims, noticing, and solicitation agent.


_/s/ Alfredo R. Pérez_
Alfredo R. Pérez

## **Certificate of Accuracy**

I certify that the facts and circumstances described in the above pleading giving rise to the emergency request for relief are true and correct to the best of my knowledge, information, and belief.


   /s/  Alfredo R. Pérez
Alfredo R. Pérez